3:20-MJ-2079
FILED
SEP 04 2020
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Kevin McCord, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for the issuance of a warrant to search the following premises and seize the items listed in Attachment B. The business is located at 1037 Summer Wood Drive Knoxville, Tennessee, and is further described in the narrative description contained in Attachment A and depicted in the photograph included in Attachment A1.

2. This affidavit sets forth facts establishing probable cause to believe that Debra Fergerson and others willfully failed to pay over tax in violation of Title 26, United States Code, Section 7202, and that within the location described in Attachment A there currently exist those items, set forth in Attachment B, which constitute evidence, instrumentalities, and/or fruits of the violations.

3. The information contained in this affidavit is based on my personal knowledge and information I have received from other law enforcement agents assisting in this investigation. The facts set forth herein are based on my review of reports, documents, and other evidence obtained since the beginning of the investigation, as well as information related to me by other law enforcement agents. This affidavit is not intended to include each and every fact related to this investigation, but only those facts necessary to support probable cause.

## AFFIANT BACKGROUND

4. I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI"), and have been employed in that capacity since March 2002. My education includes a Master of Science in Accounting and a Bachelor of Science in Accounting. I received training specific to my position through the Criminal Investigation Training Program and Special Agent Basic Training at the Federal Law Enforcement Training Center. My responsibilities as a Special Agent include the investigation of criminal violations of the Internal Revenue Laws under Title 26 of the

United States Code and related offenses, particularly as found in Titles 18 and 31 of the United States Code. In my capacity as a Special Agent with IRS-CI, I have personally conducted or assisted in conducting investigations of a variety of tax and related financial offenses.

5. Through my training and experience, I have become familiar with the types of records businesses and individuals typically maintain in the course of their regular activity, including ledgers, journals, invoices, receipts, bank documents and copies of tax returns. A large part of my duties as an IRS-CI Special Agent have involved analyzing these types of records to determine the existence of criminal activity and to develop evidence of criminal offenses. Additionally, I have participated in the execution of search warrants resulting in the seizure of financial and tax records. I have also been involved in investigations that required the drafting and execution of search warrants for computers. I have been assigned to the investigation of Debra Fergerson, P&HR Solutions and Unity Payroll.

## BACKGROUND

6. P&HR Solutions ("P&HR") provides payroll processing services to outside companies. While each agreement could be customized based on the client's needs, P&HR's typical services include the following:

a) Prepare payroll checks
b) Provide pay options including direct deposit, live checks, or pay cards
c) Deduct and remit wage garnishments, tax liens, child support, and all other required deductions
d) Provide payroll registers, payroll journals, and detailed invoices
e) Submit federal taxes, federal withholdings, and federal unemployment liability deposits
f) Submit state unemployment and local taxes
g) File and provide copies of quarterly 941 returns, federal unemployment returns, and any applicable local tax returns
h) Prepare and provide state and federal W-2 statements
i) Provide W-3 summary of federal withholdings

j) Prepare and file an annual 940 unemployment return

7. P&HR received payment for their services in two ways. Some clients gave P&HR access to their bank account and permitted P&HR to deduct the amount necessary to satisfy all the client's payroll needs, which included employee payroll, all applicable state and federal taxes, and other withholdings such as wage garnishments. Where permitted access to client's bank accounts, P&HR would withdraw their fees for providing the payroll services. This withdrawal from the client's bank account occurred every time payroll was processed, which varied client by client. Clients who did not give P&HR permission to withdraw payment for their payroll services were billed through invoices with pre-negotiated payment terms.

8. P&HR was formed on August 11, 2014 as a Limited Liability Company. Debra Fergerson ("Fergerson") was the owner of P&HR. The address listed on their initial filing was 5621 Eagle Crest Lane Knoxville, Tennessee – the residence of Stanley and Debra Fergerson. In December 2014, P&HR's principal address changed to 117 Center Park Drive Knoxville, Tennessee. In January 2017, P&HR's principal address changed to its most recent location at 1037 Summer Wood Drive Knoxville, Tennessee. On August 6, 2019, P&HR was administratively dissolved.

9. On November 21, 2019, Unity Payroll Solutions LLC ("Unity") was formed and listed 1037 Summer Wood Drive 37923 as its principal address. Philip Fergerson is listed as the registered agent. Philip Fergerson is Debra Fergerson's son.

## SUMMARY OF PROBABLE CAUSE

### *Rawlins Electric*

10. In June 2019, David Rawlins ("Rawlins") filed a complaint with the FBI to report a possible embezzlement by Fergerson. Rawlins explained in his complaint that his company, Rawlins Electric ("RE") received a letter in March 2019, from the IRS notifying Rawlins that RE owes approximately $31,000 in payroll taxes. Rawlins called his payroll company, P&HR, and spoke with Fergerson regarding the IRS letter. According to the complaint, Fergerson sent an email to Rawlins on June 5, 2019, which stated, "David per our conversation, I take full responsibility for the taxes that are owed

on your account. We will be working with our tax attorney who has just been hired for the best route for resolution on this matter. We take this matter very seriously and only want resolution on behalf of you and your company. We do not operate a fraudulent company, but we are a victim of fraud and expect resolution on that matter in the very near future. I certainly realize that this has caused you undue stress which was and is not my intention. Again, I take full responsibility."

11.  On June 28, 2019, FBI Special Agent Duke Speed ("SA Speed") and SA McCord interviewed Rawlins. Sometime in early 2018, P&HR and RE entered into an agreement where P&HR would provide payroll services for RE starting in the second quarter of 2018. P&HR agreed to process and issue payroll checks, deduct tax withholdings, prepare and file quarterly and annual payroll tax returns to the IRS, remit quarterly payroll taxes to the IRS, and issue W-2 statements to RE's employees. RE's payroll ran weekly and every week Rawlins would review and approve the payroll report and electronically transfer to P&HR RE's weekly payroll amount plus any applicable fees due to P&HR. P&HR would in turn use RE's money to pay RE's employees as well as handle all the required withholdings. Rawlins was unaware that RE's payroll taxes and the applicable quarterly filings were not being sent to the IRS until the IRS sent Rawlins the notice. The week prior to the interview with FBI and IRS, Rawlins met with Fergerson at P&HR located at 1037 Summer Wood Road Knoxville, Tennessee. During that meeting, Fergerson gave Rawlins a $6,100 check to help pay the delinquent payroll taxes. This was a check from a SmartBank account held in the name of Unity Payroll. Fergerson told Rawlins the business name on the bank account was changed due to the alleged fraud against P&HR.

12.  On July 25, 2019, Rawlins contacted SA McCord and informed him that on July 18, 2019, Rawlins again met with Fergerson at P&HR's office located at 1037 Summer Wood Road Knoxville, Tennessee. During that meeting Rawlins observed multiple offices inside P&HR. These offices contained desks and file cabinets. Rawlins also observed a computer on the desk where Fergerson was sitting at the time of the meeting.

13. On November 19, 2019, SA Speed and SA McCord interviewed Rawlins. Rawlins informed the agents that on November 15, 2019, Rawlins again met with Fergerson at P&HR's office located at 1037 Summer Wood Road Knoxville, Tennessee.

### *Diversified Power International*

14. In July 2019, SA McCord received a phone call from IRS Revenue Officer Aaron Blevins ("RO Blevins"). RO Blevins informed SA McCord that Diversified Power International ("DPI"), a business located in East Tennessee, owes a significant amount of payroll taxes to the IRS. When RO Blevins spoke with Donna Trigiani ("Trigiani"), an employee of DPI, Trigiani explained that DPI had an agreement with P&HR for payroll services and DPI had already paid their payroll tax to P&HR with the expectation under the terms of their agreement that the payroll taxes would be forwarded on to the IRS.

15. On September 6, 2019, SA McCord and SA Speed interviewed Trigiani. Trigiani works in the human resource department of DPI and selected P&HR to handle DPI's payroll. Trigiani mainly dealt with Fergerson. This relationship started on or about July 1, 2018. P&HR agreed to process and issue payroll checks, deduct tax withholdings, prepare and file quarterly and annual payroll tax returns to the IRS, remit quarterly payroll taxes to the IRS, and issue W-2 statements to DPI's employees. DPI's payroll was weekly; therefore, every week P&HR would deduct from DPI's bank account all monies necessary to cover payroll, payroll taxes, any court ordered garnishments, and P&HR's fee for providing this service. This fee was based on a fee schedule within the contract which varied by the number of employees processed.

16. DPI maintained their relationship with P&HR until June 30, 2019, which spanned 4 payroll tax quarters. P&HR never told DPI that DPI's payroll taxes collected by P&HR was never remitted to the IRS. It was not until DPI received a notice from the IRS did DPI learned that they were delinquent in their payroll tax payments. DPI owes the IRS over $400,000 in payroll taxes during the time P&HR handled DPI's payroll. Not only did P&HR not remit the payroll taxes they collected from DPI, P&HR was delinquent in filing P&HR's quarterly payroll tax returns.

### Fire Brigade Restaurant Group

17. On December 13, 2019, SA McCord and SA Speed interviewed Omar Ghorbani ("Ghorbani"), owner of Fire Brigade Restaurant Group ("FBRG"). FBRG operates five Firehouse Subs in South Carolina. On July 24, 2015, FBRG entered into an agreement with P&HR for payroll services. P&HR agreed to process weekly payroll, send FBRG's employees their paychecks, take care of all taxes, send W-2 statements to employees, and file 941 tax returns. During the course of FBRG's relationship with P&HR, FBRG received multiple letters from the IRS informing FBRG they are delinquent in payroll tax filings and payments. Each time Ghorbani contacted Fergerson regarding the letters and each time Fergerson had a reason. Fergerson first blamed an employee for using the wrong federal employer identification number (FEIN), then she claimed an employee stole money from Fergerson. Lastly Fergerson alleged P&HR's bank account was hacked, and they needed to open a new bank account under a new FEIN.

18. In January 2019, FBRG hired an outside CPA firm to reconcile their payroll. The CPA firm findings included partial payments to the IRS, late tax return filings, and some tax periods that did not have any payments made to the IRS.

19. Ghorbani was informed by the IRS that FBRG owed approximately $140,000 in payroll tax. FBRG always paid P&HR on time and the full amount.

### SouthEast Service Group

20. On December 3, 2019, SA McCord and SA Speed interviewed Gina White from SouthEast Service Group, Inc. ("SSG"). SSG entered into an agreement with P&HR on September 16, 2016. P&HR was to process and issue payroll checks, deduct tax withholdings, prepare and file quarterly and annual payroll tax returns to the IRS, remit quarterly payroll taxes to the IRS, and issue W-2 statements to SSG's employees. P&HR also was providing worker's compensation insurance to SSG. SSG had weekly payroll. P&HR invoiced SSG every Friday and SSG processed a check payable to SSG after receiving the invoice. A representative from P&HR would pick up the check sometime the following Monday. Nine months into the agreement, P&HR failed to fund SSG's payroll for the first time. Sometime later, P&HR failed to fund SSG's payroll for

the second time and soon it became more frequent. In April or May 2019, P&HR failed to fund SSG's payroll two consecutive weeks and SSG decided to end their relationship with P&HR. Fergerson blamed P&HR's lack of ability to fund SSG's payroll due to P&HR's bank account at Regions Bank being hacked. This excuse was given multiple times. Jim Rainey, an executive with SSG, spoke to a Regions Bank branch manager regarding their payroll company's account being hacked which is causing SSG some issues. This branch manager contacted internal security and internal security was unaware of any of Regions' accounts being hacked.

21.     Sometime in 2017, SSG was told by Fergerson that P&HR had reports where taxes were paid to the IRS on behalf of SSG. SSG relied on P&HR to remit employment taxes to the IRS from 4th quarter 2016 through April 2019.

## LOCATION OF EVIDENCE

22.     During October, November, and December 2019, SA McCord conducted surveillance multiple times at 1037 Summer Wood Drive Knoxville, Tennessee. During the surveillance activity, SA McCord witnessed a vehicle registered to Debra Fergerson parked in front of the business. SA McCord also viewed "P&HR Solutions" on the front door of 1037 Summer Wood Drive. SA McCord conducted additional surveillance at 1037 Summer Wood Drive on January 30, 2020 and March 10, 2020. On both occasions, SA McCord observed the business was open and "P&HR Solutions" still on the front door of 1037 Summer Wood Drive. When conducting surveillance on March 10, 2020, McCord also observed that the vehicle registered to Fergerson was at that location.

23.     Rawlins had three in-person meetings with Fergerson at 1037 Summer Wood Drive with his latest meeting was on November 15, 2019. While inside 1037 Summer Wood Drive, Rawlins saw computers and filing cabinets. During Rawlins' July 18, 2019, meeting at 1037 Summer Wood Road, Rawlins meet with both Fergerson and one of Fergerson's employees. Rawlins' was shown items pertaining to his account that was provided by Fergerson's employee. During the meeting at 1037 Summer Wood Road on November 15, 2019, Rawlins requested a payment from Fergerson. Fergerson told Rawlins that Fergerson did not have any money. Rawlins requested proof that

Fergerson did not have money and Fergerson told Rawlins that she already logged off her computer and she needed to go to a meeting.

24. Based on my training, experience, and personal knowledge of the facts of this investigation, I know that individuals and businesses maintain complete copies of bookkeeping records, tax return records and related supporting documents needed for review or verification of reports used in the preparation of financial reports and tax returns that can be used by businesses for reporting purposes. (Title 26, United States Code, Section 6107).

## INFORMATION RELATED TO COMPUTER EVIDENCE

25. I know documents, records and equipment can be in the form of printed documents or stored in computer memory, digital storage disks, or other digital storage media. Computer memory is referred to interchangeably as digital storage media.

26. The following is based upon your affiant's knowledge, training, and experience, and consultation with Special Agent Robert McCorkle, Computer Investigative Specialist, IRS-CI. Special Agent McCorkle has received specialized training regarding the seizure of computers and related evidence. Special Agent McCorkle advised your affiant that computer hardware, computer software, computer-related documentation, passwords, and data security devised may be important to a criminal investigation in three important respects: (1) as instrumentalities for the violations of federal laws enumerated herein; (2) as devices used in conjunction with the collection and storage of electronic data and records related to the alleged violations and (3) fruits of illegal activity. Search and seizure of computer hardware, software, documentation, passwords, and data security devices, either as instrumentalities of criminal activity or as storage devices for evidence thereof, is contemplated.

27. Special Agent McCorkle advised that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to insure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is necessary to seize the entire operating system, installed programs and data stored on the computer media. The computer specialist will attempt to obtain an image of the computer hard drives (that is a "bit by

bit" copy of the hard drive). This image allows the seizure of the data without actually removing the hard drive from the premises. However specific, permission is requested from the Court to remove such equipment if necessary to an off-site location, such as a computer forensic lab to process and search the computer and related media. Once imaged, the data is then processed in a secure off-site environment by a qualified computer specialist. The offsite analysis in required because of the following:

28. The volume of evidence. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, USB drives "thumb drives", etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

29. Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring specialized skills and a properly controlled environment. Since computer evidence is extremely vulnerable to destruction (both from accidental or inadvertent destruction and from destructive methods employed as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

30. Computer hardware is described as any and all computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. These devices include, but are not limited to, any data-processing hardware (such as central processing units, self-contained "laptop or notebook" computers, "tablets" and "smart-phones"); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and other memory storage devices); peripheral input/output devices (such as Point of Sale [POS] systems); as well as any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

31. Computer software is described as any and all information, including any instructions, programs, or program code, stored in the form of electronic, magnetic, optical, or other media which are capable of being interpreted by a computer or its related components. This software commonly includes operating systems, programs/applications (such as word-processing, graphics, spreadsheet programs, databases programs, accounting and tax preparation software) and utilities.

32. Computer passwords and data security devices or software are described as all those devices, programs, or data, whether themselves in the nature of hardware or software, that can be used or is designed for use to restrict access to or facilitate concealment of any computer hardware, computer software, computer-related data.

33. The analysis of electronically stored data may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files)/ "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation or in some instances operating a clone of the seized computer to allow access to the installed programs and data.

34. The terms "records, documents, and materials, including those used to facilitate communications" as used above shall also be read to include any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, hard drives, diskettes, tapes, USB (Universal Serial Bus) storage media (Thumb drives), other solid-state type storage media or any other media capable of storing information in a form that can be read or interpreted by a computer.

35. All attempts will be made by the computer specialist to obtain images of the computer's hard drive and leave the equipment intact at the search location. However, specific permission is requested from the Court to remove such equipment to an offsite location, such as the computer specialist's lab to process and search the computer and related media.

## CONCLUSION

36. Based on the foregoing information, evidence, and intelligence gathered as a result of the investigation there is probable cause to believe that FERGERSON is in violation of Title 26, United States Code, Section 7202, willful failure to collect or pay over tax and that evidence of same is located at 1037 Summer Wood Drive, Knoxville, Tennessee.

KEVIN MCCORD
SPECIAL AGENT
INTERNAL REVENUE SERVICE,
CRIMINAL INVESTIGATION

Subscribed and sworn before me
this __ day of __ 2020.

UNITED STATES MAGISTRATE JUDGE

## Attachment "A"

## LOCATION TO BE SEARCHED

The business operation of P&HR Solution / Unity Payroll is located at 1037 Summer Wood Drive Knoxville, Tennessee

The building is a multi-unit brick building which contained multiple attached businesses. Each business has its own exterior entrance. P&HR Solutions / Unity Payroll occupies the unit with the number "1037" labeled on the exterior door.

## Attachment "A1"

## PICTURE OF BUSINESS







# Attachment "B"

## ITEMS TO BE SEIZED

Items to be seized are limited to (a) those produced during or relating to the time period of July 24, 2015, through the date upon which this search warrant is executed, and (b) that relate to Debra Fergerson, P&HR Solutions and Unity Payroll.

1. Books, records, journals, receipts, invoices, billing statements and other papers, records or document that record or relate in any way to transactions involving the construction or preparation of correct or false federal tax returns

2. Records or other documents, including bank statements, bank deposit tickets, canceled checks, check registers, letters of credit, loan records, reconciliations and other records of receipts, dispositions and disbursements of funds, that relate in any way to the generation of fee income, disposition of such income, purchases of equipment and supplies, commission or other transactions involving the preparation of federal income tax returns and the rendering of federal tax services.

3. Copies of prepared federal tax returns, IRS Forms 941 and 940, files relating to the preparation of returns, correspondence, memoranda, client lists and other documents and papers that relate in any way to the preparation and transmission of federal tax returns

4. Records, documents, materials or files of the types described in paragraphs 1 and 2, above, that are kept or contained on a computer system or computer data storage. In searching computer systems and computer data, the following instructions will be apply:

    a. Agents are authorized to seize and remove from the premises any computer hardware including computer system input/output (I/O) peripheral devices and software so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

    b. Agents and computer analysts working with agents are authorized to seize the relevant system software (operating systems, interfaces, and hardware drivers), any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices (including but not limited to passwords, keycards, and dongles). In addition, they are authorized to reconfigure the system as it now operates in order to accurately retrieve the evidence stored therein.

    c. If, after inspecting the I/O devices, software, documentation and data security devices, the analyst determines that these are no longer necessary to retrieve and preserve the date evidence, and the prosecutor determines that they are not necessary to preserve as instrumentalities of the crime, the items shall be returned by them within a reasonable time unless a forfeiture action is initiated against the property.

    d.  In regard to the inspection of computers and related equipment contents for records, documents, materials and files within the scope of this warrant, agents are authorized to analyze the electronically stored data, whether on-site or in a laboratory or other controlled environment, using the following techniques, among others: (a) surveying various file "directories" and the individual files they contain in order to locate evidence and instrumentalities authorized for seizure by the warrant; (b) "opening" or reading the first few "pages" of such files in order to determine their precise contents; (c) "scanning" storage areas to discover and possibly recover deleted data; (d) "scanning" storage areas for deliberately hidden files; and (e) performing electronic "key word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

    e.  This warrant specifically authorizes the creation of a "mirror image" of a drive or other storage device or media for use in an off-site search. In that event, the agents are authorized to use the above search techniques, among others, for said search.